IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel.,** | § | |
| **JOHN BECKER**, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. **3:05-CV-627-L** |
| | § | (consolidated with Civil Action No. |
| **TOOLS & METALS, INC.,** | § | 3:05-2301-L) |
| **TODD LOFTIS,** | § | |
| **LOCKHEED MARTIN CORPORATION,** | § | |
| **and BYRON YOUNG, et al.**, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is the United States' Motion for Partial Summary Judgment, filed January 20, 2011. After considering the motion, response, reply, briefs, appendices, record, and applicable law, the court **denies** the United States' Motion for Partial Summary Judgment.

## I.    Background

This case is related to a criminal matter brought by the government against Defendant Todd Loftis ("Loftis"), the chief executive officer of Defendant Tools & Metals, Inc. ("TMI"). Loftis pled guilty in December 2005 to conspiracy to defraud the United States based on his role in submitting inflated TMI subcontractor invoices to general contractor Lockheed Martin, which in turn submitted the invoices to the government for payment. *United States v. Loftis*, No. 4:05-cr-00185-Y at dkt. # 15. The government intervened in this civil suit as a plaintiff in October 2007 and alleged claims against TMI, Lockheed Martin, and other individual defendants for violations of the False Claims Act, breach of contract, and the like.

The following facts are undisputed. On December 1, 1997, Lockheed Martin awarded TMI a Master Agreement (the "Agreement"), effective from January 1, 1998, through August 26, 2005, under which Lockheed Martin purchased perishable tools from TMI. USA App. 3. The Agreement contained a pricing provision of "cost plus a . . . 15% markup over net." *Id.* at 10. All of the costs of tools purchased from TMI under the Agreement were included in Lockheed Martin's overhead accounts, of which a portion was reimbursed by the United States. *Id.* at 118 [111:3-13].

With respect to the government's claims against Lockheed Martin, the government moves for partial summary judgment on the seventh claim of its Complaint. Specifically, the government contends that Lockheed Martin received over $10 million in payments from the United States that included costs paid under a prohibited cost-plus-percentage-of-cost ("CPPC") system of contracting. USA Compl. 28 ¶ 80. The government alleges that Lockheed Martin caused the United States to make payment in the mistaken belief that payment was due, and such payments were mistaken and not authorized. *Id.* Lockheed Martin disputes that the Agreement was administered as a CPPC contract and further asserts that the government prohibition against CPPC contracting is inapplicable to the Agreement.

## II.    Legal Standard – Motion for Summary Judgment

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the

nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.    Analysis

CPPC contracting is generally prohibited in connection with government contracts. *See* 10 U.S.C. § 2306(a); 41 U.S.C. § 254(b).  The government contends that Lockheed Martin's Agreement with TMI contained a CPPC provision, under which the government incurred expenses and made payments that it was legally prohibited from making.  Lockheed Martin challenges the government's contention on two grounds: first, that the Agreement was never administered as a CPPC contract, despite the government's assumptions to the contrary; and second, that the prohibition against CPPC contracts extends only to prime contracts with the government and subcontracts under a government prime contract – not to indirect supplier agreements between two nongovernment entities, such as the Agreement in this case.

With respect to Lockheed Martin's first argument, that the Agreement was never administered as a CPPC contract, Lockheed Martin asserts that its course of dealing with TMI differed drastically from what the government gleans from the plain language of the Agreement. Lockheed Martin asserts that the alleged CPPC provision in the contract acted only as an initial price quote from TMI, which Lockheed Martin was then free to accept, reject, or modify through negotiation.  Once a final price, which often varied from TMI's initial quote, was agreed upon, that price became fixed and was not subject to change, irrespective of any subsequent change in TMI's actual costs.  In support, Lockheed Martin submits the declarations of several current and former Lockheed Martin and TMI employees, who were involved with the day-to-day operation of the Agreement, including Lockheed Martin purchasing administrator Byron Young, Lockheed Martin purchasing representative Rusty Jones, TMI sales representative Mark Andos, and TMI representative Tammy Calvert, all of whom the government failed to depose.  Their declarations

under penalty of perjury state unequivocally that Lockheed Martin's purchases under the Agreement were made on a fixed price basis.

The record further reveals that Lockheed Martin and TMI revised the Agreement on July 7, 2005, to memorialize their course of dealing. Specifically, the revision made clear that the negotiated price was to become fixed for a period of twelve months, after which point the price would be renegotiated. *See* Pl.'s App. 88. In essence, Lockheed Martin argues that TMI used its known subsupplier costs plus a percentage markup only as a means of submitting an initial bid, not as a method to later inflate its actual costs and acquire a higher fee. Supreme Court precedent suggests that such conduct, where there is no risk of future cost inflation, does not violate the general prohibition against CPPC pricing. *See Muschany v. United States*, 324 U.S. 49, 62 (1945) ("Congress certainly did not intend to prevent a party who was merely submitting a bid to the Government from computing the amount of his bid by taking into consideration his costs and then adding a certain percentage of the cost as his profit, the resulting sum bid being fixed in amount and not subject to change.").

The government argues that *Muschany* is distinguishable from this case because, in *Muschany*, the United States was directly a party to the contract. Accordingly, in *Muschany*, the government had the option to accept, reject, or modify the proposed bid. In this case, however, the United States was not a party to the Agreement, and the government's involvement was limited only to reimbursing Lockheed Martin's overhead expenses after all purchases under the Agreement had been made. The government therefore asserts that the proposition in *Muschany* is inapplicable to this case because the government was never in control; it was bound by Lockheed Martin's price analysis determinations, at least some of which accepted TMI's initial offering of "cost plus 15% of cost." The court is unpersuaded by the government's distinction.

The Supreme Court in *Muschany* elaborated at some length concerning Congressional intent:

> Congress, by changing the original prohibition in the act from one outlawing any 'cost-plus' system of contracting so as to expressly authorize use of a 'cost-plus-a-fixed-fee' form of contract, indicated *it did not care how the contractor computed his fee or profit so long as the fee or profit was finally and conclusively fixed in amount at the time when the Government became bound to pay* it by its acceptance of the bid. By eliminating the risk of loss and permitting the guarantee of a satisfactory but fixed fee, Congress sought prompt performance and lower over-all expenditures for contracts in a rising labor and commodity market than would be offered by contractors who were compelled themselves to assume the risk of these unpredictable costs.

*Id.* (emphasis added). It appears that Congress's key concern with CPPC contracting was the potential risk of unpredictable and inflated *future* costs. Where future expenses are fixed in price, however, this concern necessarily loses its import. The court determines that, where such risks are eliminated through a fixed pricing arrangement, as Lockheed Martin contends was present here, it becomes irrelevant whether the government was directly a party to the original contract.

The government nevertheless argues that, if it accepts that TMI's prices became "fixed" under the Agreement, the resulting "evil" was even greater than what Congress originally sought to prohibit. Whereas the "evil" of CPPC contracting is that it creates a perverse incentive for a government contractor to pay liberally for reimbursable items, because higher costs result in higher profits, *see id.* at 61-62, the government uses a hypothetical example to demonstrate that the conduct in this case had the potential for even greater harm. Specifically, the government argues that if the initial agreed-upon price incorporates the supplier's costs and becomes fixed, the supplier is then at liberty to acquire the same product at a lower cost, forcing the purchaser to continue paying a high premium despite any subsequent cost reduction. The court believes this contention is misplaced.

Such "risks" of paying more, despite a subsequent reduction in cost, are inherent to any fixed pricing arrangement. By the same token, under a fixed pricing arrangement, the supplier assumes a risk that his costs will subsequently *increase*, yet he is bound to charge his purchaser the same rate. For the supplier, this can result in negligible profit margins or financial loss. The undisputed evidence in this case establishes that TMI actually maintained a file, that it called "LM Losers," which tracked a category of its product sales to Lockheed Martin that were sold at low profit margins or losses. *See* Def.'s App. 20 ¶ 8; *Id.* at Ex. A, 23-58.

In a footnote to its reply brief, the government contends that the court should disregard the "LM Losers" file because there is no evidence in the record to tie those product sales to the alleged CPPC provision of the Agreement. Even if there is not any *direct* evidence that explicitly states that the "LM Losers" file related exclusively to products sold by TMI to Lockheed Martin under the alleged CPPC provision of the Agreement, the court determines that there is more than enough *circumstantial* evidence to properly make the connection. The declaration of TMI representative Tammy Calvert states that she maintained certain lists that composed the "LM Losers" file during the time period that the Agreement was in effect. *See* Def.'s App. 20 ¶ 8. Specifically, the Agreement was in effect from January 1, 1998, through August 26, 2005, and one of the lists that Lockheed Martin has produced as part of its appendix catalogued all of the "LM Losers" for 2003 through June of that year. *Id.*; *Id.* at Ex. A, 23-58. The government has produced no evidence of any other purchase arrangements between TMI and Lockheed Martin during this time frame that would have operated independent of the alleged CPPC provision. In any event, this presents an important fact question with respect to the government's claim.

The court determines that the evidentiary record makes clear that a fact question exists with respect to whether the Agreement was actually administered as a CPPC contract. Not only has the

government failed to identify any specific unauthorized payments that were allegedly made, but the four criteria developed by the Comptroller General for determining whether a contract is a CPPC contract have not been conclusively established. For a CPPC contract to exist, (1) payment must be made on a predetermined percentage rate; (2) the predetermined percentage rate must be applied to the contractor's actual performance costs; (3) the contractor's entitlement must be uncertain at the time of contracting; and (4) the contractor's entitlement must increase commensurately with increased performance costs. *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1150 (Fed. Cir. 1983). The court believes that fact questions exist in this case as to all four of these elements.

With respect to the first element, Lockheed Martin's evidence sufficiently rebuts the government's contention that all payments under the Agreement were made at the predetermined 15% markup rate. The evidence shows that the markup rate acted only as an initial bid, which was often modified, resulting in a new, negotiated price. The government does not dispute this evidence; it only contends that by agreeing to pay *any* price (regardless whether that price then became fixed) calculated under the alleged CPPC provision, Lockheed Martin violated the prohibition against CPPC contracting.

With respect to the second element, Lockheed Martin's evidence sufficiently rebuts the government's contention that the 15% markup of TMI's costs applied to TMI's *actual* performance costs once the initial price had been set. The evidence shows that TMI's subsequent actual costs fluctuated, and in many instances resulted in a loss on the sale. The government presents only a hypothetical example of how this situation *could* lead to wrongful conduct, but it provides no evidence that TMI actually engaged in such conduct. Additionally, the government provides no legal authority demonstrating that such conduct was contemplated by Congress and is captured under the prohibition against CPPC contracting.

With respect to the third element, Lockheed Martin's evidence sufficiently rebuts the government's contention that TMI's entitlement was uncertain at the time of contracting. The evidence shows that once a price was agreed upon, it became fixed for a period of at least twelve months, which effectively locked TMI into a pricing position upon which it was certain of the amount of entitlement it would receive. The government does not dispute this evidence.

Finally, with respect to the fourth element, Lockheed Martin's evidence sufficiently rebuts the government's contention that TMI's entitlement increased commensurately with increased performance costs. The evidence demonstrates that there were at least some instances where TMI's entitlement actually diminished because of subsequent cost increases as a result of it fixed pricing arrangement with Lockheed Martin. The government does not dispute the existence of this evidence either; it only states in a footnote that the court should disregard this evidence because there is no explicit connection in the record between the "LM Loser" file and the alleged CPPC provision in the contract.

The court ultimately determines that there are genuine disputes of material fact as to the government's claim that Lockheed Martin violated the prohibition against CPPC contracting. Because the court concludes that fact questions exist as to whether the Agreement even constituted a CPPC contract, it need not address Lockheed Martin's second argument, which invokes the novel and unsettled question of law whether the prohibition against CPPC contracting extends to indirect supplier agreements, such as the one in this case.

**IV.    Conclusion**

For the reasons stated herein, the court concludes that genuine disputes of material fact exist with respect to the government's claim that Lockheed Martin violated the prohibition against CPPC contracting. The court accordingly **denies** the United States' Motion for Partial Summary Judgment.

**It is so ordered** this 13th day of July, 2011.

Sam A. Lindsay
United States District Judge